The Honorable, the judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to give their attention, for the Court is now sitting. God save the United States and this Honorable Court. All right, Ms. Hoffman, when you're ready, we'd be happy to hear from you. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court. Any reasonable person would understand that when a police cruiser blocks a car into its parking space, the passenger, driver, and car are seized. But such a seizure requires reasonable suspicion, and Black and Curry have both explained that presence in a high-crime area is insufficient to justify a seizure. Yet that is what occurred here. Only when officers escalated their unlawful seizure by approaching the vehicle did they see a passenger concealing a firearm. But Black prohibits the application of reasonable suspicion merely by association or geography. Excuse me, you said that merely being in a high-crime area won't suffice to establish reasonable suspicion, and of course, that's correct, although ward law, the Supreme Court seems to suggest, might be otherwise. But don't we have more here than simply a general high-crime area? Because this wasn't generally a high-crime area. There have been a number of drug arrests made at this very lot, at this very parking lot. Why wouldn't that be something more than a generalized high-crime area? Because, Your Honor, I think in this particular instance, the cases that were cited by the government, all in which there were other circumstances, all included officers responding to a specific call. And in this particular case, there was no specific call. It was a routine patrol, and the officers really indicated that they mostly responded to loitering concerns on behalf of the motel owners. And in this particular instance, the officers drove past the car, saw nothing suspicious other than people sitting in the car, and it was only because it was a high-crime area that they were even present in the first instance. And Black and Curry both reject the assumption that predictive policing, like, for example, because there had been crime there before, it must mean there will be crime there again, should be rejected because it is race-based and inappropriate under the Fourth Amendment. The car wasn't just sitting there, was it? I mean, the motor was running. The headlights were on. Correct, Your Honor. The driver was running in for some kind of reason, but it wasn't just a car sitting there, was it? The car was running, Your Honor, and the lights were on, which tended to indicate that the driver had run in for a quick purpose, which happened to be a lawful purpose of visiting his girlfriend. It was a long residence motel, or an extended stay hotel, excuse me, and Mr. Cloud's girlfriend was residing there, and he had lawfully entered the premises for that purpose. The officers did not see Mr. Cloud go into the motel. When they drove by, all they saw were individuals sitting in the car, which is not unlawful, and which they admitted was not unlawful. Even if we assume, for instance, that Mr. Cloud had been sitting in the car when the police came up and he stayed in the car so that there might be a seizure, that's not what happened in this case. Because in order for the seizure to be effectuated, there has to be acquiescence by the defendant to the seizure. I've watched this tape a number of times, and it doesn't look like to me Mr. Cloud acquiesced to much of anything. He got in the car, he got out of the car, he walked around, officers asked him to come back, he kept going, he ignored their instructions. He seemed to do pretty much what he wanted to do. So I'm having difficulty seeing how this gets beyond an attempted seizure because there was no acquiescence by Mr. Cloud to it. Your Honor, I think I have several points there. I think first, our position is that as soon as officers blocked the car, the car was seized. And so when Mr. Cloud exited the motel room, he was seized. This court's authority in Jones and Stover both indicate that when a car is blocked, that is a higher escalation of seizure. And this court in Jones cited multiple circuits, including the Sixth and the Ninth, that have been in accord that when there is a car... Yeah, but he still has to acquiesce. And it's just hard watching the video to see where that ever happened. Well, Your Honor, I think that our point is that he was seized before any of those other actions occurred. And what happened after Mr. Cloud was seized is irrelevant to the inquiry. But in any event, our position is also that when Mr. Cloud left the motel, Officer Jenkins told him or asked him if he was staying there. Mr. Cloud responded. He asked him how he was doing. Mr. Cloud responded. When he did get out of the car, we believe that at that point, when he gets into the car, he's asking increasingly incriminating questions. And the presence of officers has now escalated to the point where there are six uniformed armed officers and at least two to three patrol cars present. And Mr. Cloud was seized at that point. Anything that happens after he gets out of the car doesn't matter. But even if this court were to consider what was wrong with approaching the car with a flashlight, which is essentially what they did. Your Honor, I think that in this case, it's distinct from other instances in which there's a police citizen encounter. A police citizen encounter is one in which the officers approach the person and the person can terminate the encounter or not. But here, the fact that the officers blocked the car without knowing whether there was any reasonable suspicion escalated it from merely a police citizen encounter to an immediate seizure. And in this particular case, the officers did not have the necessary reasonable suspicion to escalate to a seizure. Excuse me, we had a judge drop off. Can I pause everything for a moment? Thank you. Your Honor, could you remind me of which question it was that you dropped off and I can go back and try to answer it? Well, I had asked you about the acquiescence of Mr. Cloud, and you were starting to give your answer to why he would have acquiesced soon. But I could see you talking, but I couldn't hear you, so I lost at least a minute. Okay, I will try to answer again, Your Honor. In this particular case, Mr. Cloud passively acquiesced to police authority in several ways. I also have watched the videos on multiple occasions, and as this case law makes clear, that when there's an ambiguity as to whether or not someone passively acquiesces, the court must look to the totality of the circumstances to determine whether or not someone was seized. And here, Mr. Cloud left his hotel room. He answered questions by Mr. Officer Jenkins, including how he was doing, why he was staying, or why he was present at the hotel. He did get into the car, but he didn't leave because he was locked in and unable to leave. And then the officers began to… Ms. Hoffman, can I stop you there? So let's assume for the moment we don't agree with you that Mr. Cloud was seized when the police blocked the car because he wasn't physically in the car at the time. And he wasn't seized while he was outside of the car because, as Judge Agee suggested, he was pretty much doing whatever he wanted. When he got back into the car, I suppose that's when he would have had the opportunity to leave the scene, but for the fact that the car, as you point out, was blocked by the police cruiser. But by then, as I understand the record, the officer had seen something in the back of the vehicle, the teenager trying to hide something under the car that gave him some suspicion as to criminal activity being afoot. So why wouldn't that be enough then at that point, if we don't agree with you as to the seizure, that the officers were entitled to continue their investigation, including holding Cloud until they resolved the issue as to what had been hidden by the passenger in the car? Your Honor, I think there are two responses to that. First, Mr. Cloud, when he did get into the car, we agree that by that time the officer had what we believe unlawfully escalated the initial seizure of the car by approaching it and seeing the passenger concealing the firearm. But here, as opposed to many other cases in which the court determines that they can continue or need to continue an investigatory detention, in this instance, the police officers knew who had committed the crime, and they knew it was not Mr. Cloud. They had seen the passenger conceal the firearm, and Mr. Cloud was not present when that happened. And so Black makes it very clear, this court's authority, that mere presence or association with someone who may have been involved in criminal activity cannot be imputed to another person at the scene. Does it matter, Ms. Hoffman, that at some point in the investigation, Mr. Cloud admitted that the car belonged to his mother and that he was in lawful possession of the car? Does that somehow give the officers the right to investigate, given that a firearm was found in a car that was in the possession of Mr. Cloud at the time? No, Your Honor, I don't think that it does. Even under North Carolina law, concealment of a firearm requires willful and intentional or knowing mental state. And in this particular instance, there was no indication that Mr. Cloud had any knowledge that the passenger had concealed the firearm for several reasons. First, the officer Jenkins admitted at the evidentiary hearing that he was able to see Mr. Cloud's hands the entire time that he was in the car. But second, the officers had no information about what Mr. Cloud, how long Mr. Cloud had been in the hotel, whether or not even the passenger had entered the car sometime after Mr. Cloud went into the hotel, or perhaps even the passenger obtained the firearm after Mr. Cloud was in the hotel. There was no reasonable suspicion as to Mr. Cloud, other than the fact that the officer saw the passenger concealing a firearm. And under Black's authority, that is not enough in this circuit to associate Mr. Cloud with reasonable suspicion to seize him. Well, you say he was disassociated from all of this, but on the other hand, he was the only adult in the car. And he was driving the car, certainly, because it was a driver's seat that was vacant when he went into the motel room. And you have this Supreme Court case called Wyoming v. Houghton that says there's very often reason to believe that there is a common enterprise between the driver and the passenger. And they seem to be there sort of in it together, or at least the officers could surmise that they were. And even if they were not, when they saw the weapon put under the driver's seat, surely they are afforded a certain latitude in trying to investigate what's up. I mean, this is not a situation where they're responding to an anonymous report or an informant, someone that refuses to give the name. I mean, this is a situation where there is direct observation of criminal activity, and where you have direct observation of criminal activity as opposed to some sketchy informant's report, aren't officers entitled to look into a situation after they directly observe a criminal act? Your Honor, I think I have several points that I'd like to address in that compound question. The first is that the officers did not know that the men in the car were juveniles until long after Mr. Cloud was seized when they ordered the passengers out of the car. And so the fact that Mr. Cloud happened to be the only adult was not known to the officers at the time and can't be used as reasonable suspicion. In terms of Your Honor's citation to Wyoming v. Houghton, first of all, that was different because that was a legitimate traffic stop. And there was reasonable suspicion of a crime being occurred because of the legitimate traffic stop. Here, however, there was no such reasonable suspicion. The only reasonable suspicion for why they approached that car was because it was in a high-crime neighborhood. And under Black and Curry, that is not correct. But that's not correct. It's not just a high-crime neighborhood. They'd made previous drug arrests on this very lot. It's not just sort of generalized assertion of a high-crime neighborhood. But to me, the question is when officers see circumstances like this and you combine them all together, which was the history of the lot plus the concealing the gun right before them under the driver's seat and the rest, why don't they, surely they're not just required to just, oh, well, wash our hands of it and walk away when they see what is apparent criminality right in front of their eyes. Can't they look into it? Your Honor, yeah, I think that they're, I mean, my initial response is no. In this instance, the officer should not have pulled behind the red car because they had no reasonable suspicion to block it in. They could have approached on foot and asked the passengers questions, but instead they escalated it to a seizure absent any reasonable suspicion. Well, how are Cloud's rights violated? He's a defendant here. He wasn't even in the car. Once he came out of the car, Your Honor. Was he? No, he wasn't. But the escalation continued from the initial unlawful seizure. But in any event, once Cloud came out, assuming that this court determined that Mr. Cloud can't object to the initial seizure, when Cloud came out and the officer saw the passenger conceal the firearm, I will agree that, you know, assuming that this court finds that the initial seizure wasn't a seizure at the time that they blocked the car, then certainly the officers can ask questions of the passenger. But Mr. Cloud, that cannot be imputed to him when there is absolutely no information that he knew about the firearm, that he was present when the firearm was concealed. Ms. Hoffman, can I follow up on Judge Wilkinson's question? So what you're suggesting is that at that point in time, the officers were obligated to let everybody go except for what ended up being the teenager in the back of the car. Is that your argument? If the officer had ordered everyone out of the car, Your Honor, then yes, the officer had reasonable suspicion as to the backseat passenger and no one else. And simply also because in United States v. Black, and I see my time is up, if I may finish the question. Yes, you may. Thank you, Your Honor. In United States v. Black, this court also rejected the idea that where there is one gun, there are two. And that is what happened here. The officers assumed that because the backseat passenger had had a firearm, that that meant Mr. Cloud must have had one as well. And that is not appropriate, and it is not something that this court has accepted. What do you base that on? I'm sorry, Your Honor. Why do you say that they thought there were two guns? Your Honor, I think that they've assumed, and if you go back and watch the video, when they found the gun in the backseat, they said, we've got them. And they ran and tried to find Mr. Cloud, or excuse me, they then proceeded to try to arrest Mr. Cloud under the assumption that he had somehow participated in criminal activity. And there simply isn't evidence of that here. Well, they may have been detaining him, but I don't see a basis in the record for you to use this one-gun, two-gun presumption. Your Honor, I'd have to look at my sites again, and I can try to find it for you. But my recollection of the record was that they had testified at the evidentiary hearing was they didn't know if Mr. Cloud was armed as well. And it's on that basis that I made that argument. My problem, I keep coming back to the basic point that where officers see a criminal act unfolding before their very eyes, then what they have to do is walk away. Either one, just leave. Or number two, look at only one occupant of the car, when as I come back to Wyoming v. Houghton, suggests that there's an association, to put it mildly, between people. And I just don't understand why it's a matter of common sense. They can't look into something further. They didn't use unreasonable force against anyone. They patted somebody down, they frisked, but obviously they frisked because there was a gun. And all they want to do is just find out what's going on. And there's a good chance that what's going on isn't legitimate, but they just wanted to learn more. Your Honor, I'm not suggesting that once they saw the gun, they had to walk away. I think the initial problem was that they saw the gun in the first instance, in how they seized the car. And I think that once they saw the firearm, absolutely they were permitted to look into it with regard to the passenger. In Houghton, when they spoke about the common enterprise, it was because in Houghton, the officer saw a needle in the driver's pocket, and the driver admitted he used it for an unlawful purpose. Houghton doesn't stand for the principle that you can seize and search any person that happens to be at the scene. What Houghton held is that in that instance, officers may search the car and the containers within the car, not the individuals associated with the car. Houghton doesn't extend the principle that far. All right, thank you. Thank you, Your Honor. I'm sorry, Judge Wilkinson, I have one additional question for Ms. Hoffman. Absolutely, go ahead. Thank you. So the district court in this case concluded that Mr. Cloud was not seized until he was actually tackled and taken to the ground and subdued by the officers in this case. And let's assume that that's correct, and at the time that they attempted to detain him, he resisted and fled. Do you concede that even if there might not have been enough suspicion at the time to detain Cloud, that once he fled, that that additional factor is added to the mix in deciding whether or not the officers had at that point caused to seize him? Your Honor, I don't, for two reasons. First, it's that in order for that to occur, for example, the government cited United States v. Ruffin. And in Ruffin, the reason that this court upheld the subsequent arrest and concluding that Mr. Ruffin had not acceded to authority was because the initial stop was supported by reasonable suspicion. And we're arguing here that that is not the case. Also, in this court's authority in United States v. Sprinkle, the court determined that officers had legitimate reason to arrest the defendant after the fact only because he committed a new crime. And it was that his illegal actions were new and distinct from any crime he may have been suspected of at the time of the initial stop. And in this instance, the fact that Mr. Cloud fled was not based on a new crime such as Sprinkle, where Sprinkle aimed his gun at the officer and shot. And so in this particular case, we don't believe that the initial seizure was lawful, and therefore any subsequent attempt to again seize Mr. Cloud violated the Fourth Amendment. All right. Thank you very much, Judge Diaz. Do you have further questions? I don't. Thank you very much. All right, Judge Agee, do you have any further questions? No, sir. All right. And let's hear from Mr. Enright.  Anthony Enright for the United States. The district court properly denied Cloud's motion to suppress for a couple of reasons. But I think perhaps the most direct one is that Brendlin v. California teaches that police can detain a car solely to investigate a passenger's conduct. Officer Skipper testified unequivocally not just that he saw something suspicious going on in that car, but that the passenger was illegally concealing a gun. He saw the butt of a gun, and he saw him conceal it under the seat. That authorized – the Fourth Amendment authorized police to detain the car and to detain all of its occupants. Mr. Enright, but Ms. Hoffman is saying that the car was detained or seized even before the officer saw the weapon under the seat. So how do you respond to that? I have a couple of responses to that. The first, I think, perhaps the one I need to make now, is that that issue is waived. That was not what the defense argued below. And the defense counsel's words were, we are arguing that Mr. Cloud was seized the moment he got into his car. And that was not the – so it was forfeited below, and it was not the argument in the opening brief either. So I would start with that, but the perhaps easier answer is Cloud wasn't even on the scene. When you speak of – the conduct needed to detain a person is intentional conduct directed at the detained individual. Mr. Cloud was entirely inside the motel at the time they pulled up, and even at the time they approached and shined the flashlight. He came out after they'd seen the gun. He certainly got in the car. Had he been in the car when they pulled up and blocked the car in the way that the record suggests, would that have been a seizure? That would have been a tougher case, Your Honor. There is some testimony about – I mean, I think one of the – that becomes a question under the Mendenhall factors. It suggests under the Mendenhall factors, really the only question – the only Mendenhall factor at the time was really that there were police in uniform. At that moment, there were not a large number of police. They hadn't asked any questions. The car was only partially blocked. And, you know, Mr. Cloud also – he put his head over his shoulder. He didn't see that it was blocked to the extent he did at all until after he was well into the car. So that is a tougher question, but I think the answer could be no. But certainly the way the facts shook down in this case, Mr. Cloud wasn't detained because he was certainly free to leave. He could have stayed in the hotel room, or he could have just walked away. He chose to put himself in the car, and he chose to put himself right in the scope of Brendlin. What Brendlin says is a reasonable person wouldn't expect that you can just come and go from the focal point of an investigation. And that's – in the Brendlin case, the focal point was the car. Police have a bright-line rule authority, if they have reasonable suspicion of criminal activity going on in a car, to detain all those occupants while they're investigating this. And this entire exchange, from the moment they walked up to the car to the time that Cloud began to flee, was about five minutes. And that was moments after they pulled the gun out of the car. So that was certainly within the scope of the reason for detaining the car, the reason the Fourth Amendment authorized them to detain the car. So the Fourth Amendment authorized – So, Mr. Enright, can I – so at the time that the officers saw what they believed to be a gun being secreted under the passenger seat, what crime, if any, did they suspect Cloud of committing? So what – I don't know if there was testimony that they suspected him of a specific crime, but the standard is an objective one. And they certainly, I think – and I want to mention that this is a different point, because they didn't need to suspect Cloud of a crime in order to detain him at the scene of the car he was in. That's the bright-line rule of Brendlin and the bright-line rule of Arizona v. Johnson, is you do not have to have individualized suspicion of, for example, the passenger, if you're stopping the driver under Brendlin, of the driver if you're stopping the passenger. So – and you have reasonable suspicion for that purpose. So I – and I don't mean to not answer your question. What I think the police were suspecting is that he may be in a common enterprise with the other members of the car. And I think they had good reason to that. To the extent reasonable suspicion of Cloud individually is necessary, I think they absolutely had it under the objective factors they were facing. Because the individual in the back seat, the officer testified, he held his gun in his hand in front of the other people in that car, including Cloud's daughter. He wouldn't have done that if he didn't trust them, especially in a high-crime area. And when they pulled up behind the car, they saw everyone sort of averted their eyes and rolled up the window. It wasn't just L.W. who didn't want to interact with the police or who was perhaps concerned about that. The police had reason to suspect that whatever was going on with L.W. was an enterprise involving everyone in the car. And when Cloud got in the car as if he were the driver, as if he had driven them there or as if he were going to drive them away, he gave them reason to suspect that whatever armed enterprise was going on in that car, he was involved in. And it's very telling, Your Honor, that L.W. hid that gun under the seat feverishly in response to police shining a flashlight in there. And then when they asked him about it, he said, oh, it's just a cigarette. In other words, he was concealing that gun. To the extent he had the right to carry a gun openly, he wasn't saying, oh, Your Honor, I'm just lawfully carrying this gun. He was concealing that gun from police, which is very suggestive of the fact that he was perhaps using that gun for a purpose he didn't want police to know about, in other words, illegal activity. And in a high crime area where they've seen violent crime, drugs, gun crime in that area recently, that's certainly suggestive of the concern that these folks hanging out in a car, armed, and concealing that gun from people who were engaged in criminal activity that warranted not arresting them necessarily, certainly not proof beyond a reasonable doubt, but simply investigating further. The reasonable suspicion standard is not a high bar. It's well lower than a preponderance of the evidence. It's well lower than probable cause. It's more than an intuit hunch, just what's necessary to investigate further. And if you're seeing a firearm, it's a very dangerous situation, not just for the police officers, but also for the other people on the scene and the people in the motel and the people in the parking lot. That's something police really have an obligation to investigate. And to do so safely, they need to at least control the scene and detain the people who are in that car. Well, Your Honor, I don't want to belabor any points that I've touched on a little bit. I think I've touched on pretty much everything I wanted to say. I think those are two rationales. One is the Brindlin, Arizona v. Johnson rule, and another is reasonable suspicion. I think either one were there. I do want to note that I think Judge Wilkinson mentioned that, of course, they wanted to pat him down. They certainly had authority to pat Cloud down because you can pat somebody down if you have reason to believe he's armed and potentially dangerous. And his association, his close association with a gun, whether he was involved in crime or not, authorized the pat down, certainly, because the police were authorized to stop him. Well, the whole situation, when you put it all together, is fraught with a certain amount of danger. And that's, you know, to me, that's important because I think the officers had every right to protect themselves and not be shot. And they also had a right to protect other passengers in the car and to deescalate the situation if they could. And I worry if we were to reverse Judge Cogburn here, that we would say in the face of a dangerous situation and in the face of incriminating evidence and in the face of a situation where it appears that the people in the car, the different people in the car, were not just disconnected, but were at least quite possibly aware of each other's activities, that the police have to sort of cease and desist, that they can't ensure their own safety, and that the only option for them is to certainly throw up their hands and walk away. And I just don't think that can be right, and the implications of a position like that for law enforcement would be serious. You know, that's just a common sense assessment of the situation, which I guess was Judge Cogburn's too. Absolutely, Your Honor, and that sense, which is both very consistent with common sense, but it's also well backed up by Supreme Court precedent. Maryland v. Wilson and Arizona v. Johnson both make very clear that the danger presented by an ordinary traffic stop, a circumstance where you stop someone for speeding, is not that the people in the car are going to react badly to being caught for speeding. It's that they might react violently if police discover that another crime is going on in the car when they conduct a traffic stop. Here, that risk is right in the face of police officers, because what they observed wasn't speeding. What they observed was somebody committing a gun crime in the car. The risk they faced was very real, and you can see that, I think, in real terms in Officer Jenkins' testimony in the video itself. He was very careful. He didn't want to escalate the circumstance and let everybody know he found a gun until he got everybody out of the car and detained them. And that was reasonable. That was exactly what you might expect police to do to protect their safety and to protect the safety of others. And that's all the Fourth Amendment asks that police act reasonably. Did you address already the question of if there was a seizure at some point, whether or not Mr. Cloud ever acquiesced to a seizure? So I think I haven't really addressed that. I'm happy to do it now. I think I have to admit that there was a seizure at some point, which is when physical force was applied. Even if somebody doesn't acquiesce, if police officers physically restrain him, that's a seizure. I think it's certainly questionable whether he acquiesced. Well, he clearly didn't acquiesce at any point until he was seized. I've watched the video. Judge Cogburn watched the video, and we heard the testimony of police officers where he was ignoring commands to go hang back with other police officers. I know my friend disputes that he heard it, but it was a pretty loud command on the video. And the officer testified that it was ignored, and the district court was free to credit that. So I don't think he – he probably didn't acquiesce. I do think it's a bit of a red herring, Your Honor, because we ultimately did seize him – or police ultimately did seize him at the time when his flight started and after they seized that gun. But it's also a red herring because police had the authority to stop that car and detain him from the get-go, from the moment they saw the gun in the car and from the moment he then got in the car. And to the extent they gave him – or he had, because he didn't acquiesce or because police gave him the liberty to continue to hang around in the scene instead of ordering him to stay in the car, which they well could have done under this court's decision in Myers, which is an unpublished decision applying Arizona v. Johnson. To the extent they gave him more liberty, they certainly didn't violate his constitutional rights by doing that instead of saying you've got to stay in the car. So I don't know if that is the most efficient answer to your question, Your Honor, but I hope it addresses it. If there are no further questions… Judge, do you have any further questions you'd like to ask? No further questions. Judge Diaz? Judge Diaz? No, thank you. Okay. Ms. Hoffman, you have some time for rebuttal, so we'd be happy to hear from you in rebuttal. Your Honor, just a couple of points. The government relies heavily on Brendlin and Arizona v. Johnson, and they mentioned United States v. Myers. All of those cases are different because they all involve a traffic stop. And I know that seems like semantics here, but it's not. A traffic stop is premised on the idea that someone has committed a crime or some sort of traffic violation which provides the officer with reasonable suspicion to stop the car. And in this instance, there wasn't a reasonable suspicion for the officers to approach that dodge. And at that point, in Brendlin, for example, the court held that they learned that he had – the passenger had an outstanding warrant, but it was after they had already stopped the car lawfully. And we just don't have that here. Your Honor, I also wanted to address one point that I forgot to address earlier about this being a high-crime area. I went back and looked at the testimony, and Officer Skipper, I believe, indicated that the task force had only made two prior arrests in that parking lot. This wasn't an issue where there was an arrest every night for weeks on end. This was a high-crime area that was an area of predominantly African-American and Latino residents that was being patrolled for predictive policing, which, as this court has found, is not a reliable indicator of criminal activity. In terms of the pat-down, Your Honor, I would note that, yes, it is true that for an officer to pat down a person, they must have reasonable suspicion the person is armed as dangerous. But they only proceed to that step if they also first had indication that that person, the individualized suspicion that that person was engaged in criminal activity. And they did not have that here. They had no indication that Mr. Cloud was involved in criminal activity. With respect to their initial approach, you have a—obviously, I think Mendenhall is a keystone case, but officers are not forbidden from approaching a car or an individual or whatever and asking questions. The Supreme Court has repeatedly made clear that police officers, for a great many reasons, have a perfect right to approach an individual or a group of individuals and ask questions. Your Honor, I don't dispute that. I agree that that is what Mendenhall holds. And if the officers in this case had merely approached the car on foot and not blocked the dodge and preventing it from leaving, they could have asked questions of the individuals in the car, and we would have been, I think, dealing with a different circumstance. But in this case, the officers immediately escalated the situation by blocking the car so that when Cloud came out, when the passengers were in the car, no one was able to leave from the very first jump. And in that particular instance, that's why this case is— Well, I mean, but the problem is, again, Cloud is the individual who is seeking suppression of the evidence. And there's a question of how Cloud's rights personally could be violated if he's nowhere in the car or is in a hotel room. I mean, that would seem to me to be a difficult case for him to make because he was not on the scene. Your Honor, as soon as he exited that hotel room—I mean, frankly, when they blocked the car, had Cloud exited the hotel room and tried to leave, he would have been prevented from doing so. And in fact, that's actually exactly what occurred. As soon as Cloud left the hotel room, he was seized. And the officers knew who committed the crime when they did approach after they had blocked the car, and it was not Cloud. Cloud was not associated with the juveniles. The officers had no information whether or not Cloud had—whether all of that had arrived with him. And it's clear that the officers are looking into a matter and are investigating a matter and the rest. He doesn't have the right to simply say, to heck with you, I'm going to get in the car and drive off. And if an investigation is ongoing or there is a—it reasonably appears that the officers are looking into something, if they're looking into an action by a passenger in the car, the driver in the car is not privileged to say, well, to heck with you, I'm going to—I'm getting in this car and drive off. Now, you see what I mean? He didn't have the right to flee, and he didn't have the right just to get in his car and saying you can't—didn't say it to the officers. In effect, you can't do anything about it. I'm gone. Your Honor, in this case, the officers are required under the Fourth Amendment to have reasonable suspicion that Cloud was engaged in criminal activity, and they did not have that here. I see my point of that. Do you have any other questions? He wasn't—Cloud wasn't at the North Pole. He was the driver of the car. He was the driver after. I mean, the officers didn't know if Cloud drove to the motel. There happened to be an empty driver's seat, but the officers don't know what happened because they did not see Cloud get in or out of the car. They didn't see how they arrived at the motel. Certainly, Cloud got into the car. At one point, my opposing counsel indicated that his daughter was in the car. But again, officers saw his hands at all times and knew that Cloud was not the one that had hidden the gun under the driver's seat. They saw a crime being committed. They knew who committed that crime, and that person was not Mr. Cloud. All right. Thank you very much, Ms. Hoffman. We certainly do appreciate your argument. And if either Judge Agee or Judge Diaz has further questions, I'd be delighted to have them ask them. No questions. Judge Diaz? I don't either. Thank you very much, Ms. Hoffman. All I want to say is I want to thank both of you for your arguments. And it's very disappointing to all of us that we don't have the opportunity to come down and greet you personally and shake your hands and say thank you for your service, not only to your clients, but to the court. But I can assure you that it's very much appreciated. And please, both of you, have a nice day. Thank you, Your Honors. Thank you very much, Your Honor.
judges: J. Harvie Wilkinson III, G. Steven Agee, Albert Diaz